| | | |
|---|---|---|
| MGN LOGISTICS, INC. D/B/A LASER TRANSPORTATION SYSTEMS, INC., | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. 16 CV 4301 |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, and TRANS LOGISTICS, INC., | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff MGN Logistics, Inc. ("MGN") arranged for Defendant Trans Logistics ("Trans"), a freight carrier, to deliver a shipment of copper coils worth more than $132,000, but the cargo was lost. Trans had an insurance policy with a general limit of $250,000, but the policy limit was reduced for loss of certain kinds of valuable cargo, including copper, if the insured did not take adequate steps to protect that cargo: specifically, if the vehicle transporting valuable cargo was not protected by a driver, an alarm system, or a locked fence, then the coverage limit for loss of that cargo was reduced to $5,000.

In this case, the cargo was stolen after the driver left the vehicle unattended in a parking lot overnight. MGN paid the owner of the cargo, and then, presumably as Trans's subrogee, made a claim on Trans's insurance policy. Invoking the reduced limit for copper cargo not properly secured, Trans's insurer, Essex, offered just $5,000 on MGN's claim. MGN rejected this offer and turned to its own carrier—Defendant Travelers Property Casualty Company of America ("Travelers"). Travelers had issued a policy of "contingent" insurance to MGN, but Travelers, too, declined to pay the loss. Travelers noted that the contingent insurance policy it issued to MGN provides coverage only when the primary insurance carrier declines to or is unable to cover a loss; the policy also provides that Travelers will not pay more than the "actual

limits" of the primary policy. Because Essex has offered the "actual limits" of its coverage—$5,000—Travelers contends it is liable in that amount at most.

MGN has sued Trans and Travelers for the value of the cargo. Trans is in default, and MGN and Travelers have filed cross-motions for summary judgment on Travelers's liability for the full $132,000 loss. For the reasons stated below, Travelers's motion is granted. MGN's motion is granted in part and denied in part. The court concludes that Travelers's liability, if any, is limited to $5,000.

## BACKGROUND

### I.     Local Rule 56.1

In its response to Travelers's Local Rule 56.1 Statement of Facts, MGN purported to admit many of Travelers's proposed facts, but added a qualifier to several of these admissions: "Admitted; however, the First Amended Complaint cited to by Travelers is a document which speaks for itself and any characterization that does not comport with the plain language of those documents is denied." (*See, e.g.*, MGN's Resp. to Travelers's Local Rule 56.1 Statement of Material Facts [32] ¶ 1.) MGN did not identify any specific discrepancies, however. The court issued a minute entry noting that without such information, it would "assume that Defendant's statements and characterizations are accurate." (Minute Entry [33].)

MGN submitted an amended response, altering the qualifier only slightly; it now responded to Travelers's statements of fact with language like this: "Admitted; however, the First Amended Complaint cited to by Travelers is a document which speaks for itself and any characterization *or construction* that does not comport with the plain language of those documents is denied." (*See, e.g.*, MGN's Am. Resp. to Travelers's Local Rule 56.1 Statement of Material Facts [34] ¶ 1 (emphasis added).) This addition hardly solves the problem; it does not explain how Travelers's citation is an improper "characterization" or "construction" of the cited document. At worst, this qualifier suggests that Travelers has cited to a source that does not accurately support the claimed fact, a serious accusation.

But as far as the court can tell, Travelers has not misrepresented any sources. For example, MGN has hedged on admitting the first paragraph of Travelers's Statement of Facts: "Plaintiff, MGN Logistics Inc., is a freight broker in the business of connecting shippers and their cargo with interstate motor carriers." (Travelers's Statement of Facts ("DSOF") [22] ¶ 1.) To support this assertion, Travelers cites a paragraph of MGN's own complaint, which squarely supports Travelers's statement: "As a federally licensed freight broker, MGN is in the business of connecting shippers and cargo, with interstate motor carriers who haul the cargo/freight. MGN is merely an intermediary and does not transport goods. MGN is not authorized to transport anything and owns no transportation equipment." (First Am. Compl. [16] ¶ 7.)

MGN cannot in good faith dispute Travelers's statement, nor does MGN identify any other specific misrepresentations in its qualified admissions. Because MGN has not provided any reason for the court to question Travelers's citations, and has failed to clarify after the court's request, the court assumes those citations are accurate. *See Poole v. U.S. Gen. Accounting Office*, 1 F. App'x 508, 510 (7th Cir. 2001) ("Any facts in the movant's statement that are not specifically denied will be deemed admitted in considering the motion for summary judgment.").

## II.      MGN Arranges for Trans to Ship Copper Coils

As reflected above, MGN, a freight broker, connects shippers and cargo with interstate motor carriers. (DSOF ¶ 1.) On January 6, 2014, MGN acquired substantially all of the assets of Laser Transportation Systems, Inc. ("Laser"), which appears to have conducted the same type of business. (Ex. J to MGN's Mot. for Summ. J. [24-10].) The asset purchase agreement provided that all insurance policies would "be maintained until the [c]losing." (*Id.* at 7.) MGN apparently continued to operate as "Laser Transportation Systems."

In May 2014, MGN arranged for Trans, an interstate motor cargo carrier, to transport a shipment of copper coils from Weiland Metals in Wheeling, Illinois, to Laars Heating Systems in Rochester, New Hampshire. (MGN's Local Rule 56.1 Statement of Material Facts ("PSOF") [23]

3

¶ 17; DSOF ¶ 2.)[1]  The contract between MGN[2] and Trans required Trans to insure the cargo in the amount of $150,000.  (Ex. A to First Am. Compl. [16-1] ¶ 3.)  Trans also agreed to indemnify MGN "for any liability resulting from loss or damage" to the cargo.  (*Id.* at ¶ 8.)  Sometime between May 16 and May 17, 2014, a Trans driver picked up the cargo from Weiland.  (DSOF ¶ 3.)  The driver for Trans drove the trailer containing the coils to Addison, Illinois, and left the trailer unattended in a parking lot overnight.  (DSOF ¶ 3; Ex. B to MGN's Resp. to Travelers' Local Rule 56.1 Statement of Material Facts [31-2] at AE037.)  Upon returning, the driver discovered the trailer was missing and reported the trailer and coils stolen.  (DSOF ¶ 4.)

When Trans failed to deliver the cargo, Laars made a claim to MGN.[3]  (Ex. N to MGN's Mot. for Summ. J. [24-14].)  On November 4, 2014, MGN paid Laars $132,426 to satisfy Laars's claim.  (DSOF ¶ 5; PSOF ¶ 21.)  MGN then submitted a claim to Trans's insurer, Essex Insurance Company ("Essex"), and to its own insurer, Travelers.  (PSOF ¶ 22; *see* DSOF ¶ 8.)  Both insurance policies are at issue in this case.

### III.    The Essex Policy

Essex issued an insurance policy to Trans for a policy period from January 17, 2014 to January 17, 2015.  (Ex. H to MGN's Mot. for Summ. J. [24-8] at AE085.)  The "limit of loss" was $100,000.  (*Id.* at AE086.)  On March 4, 2014, an endorsement to the policy increased that limit to $250,000.  (*Id.* at AE084.)  The Essex Policy also included a "Special Theft Warranty Endorsement."  (*Id.* at AE083.)  That endorsement limits Essex's liability for the loss of certain types of goods left unattended in a vehicle.  Specifically, the endorsement states:

---

[1]    MGN states that the coils were to be delivered from Laars to Weiland (PSOF ¶ 18), but the bill of lading indicates that the shipment was going from Weiland to Laars.  (Ex. K to MGN's Mot. for Summ. J. [24-11].)

[2]    MGN is identified as Laser in the contract.  (Ex. A to First Am. Compl.)

[3]    The record does not make the relationship between MGN and Laars explicit, but the court understands that MGN was responsible for ensuring that Laars would receive the cargo.

As respects shipments consisting of:

Furs, Garments Trimmed with Fur, Silks, Rayons, Wearing Apparel, Cellular Telephones, Liquors, Cigarettes, Drugs, Pharmaceuticals, Automobile Parts & Tires, Computer Parts & Accessories, Radio & TV Sets, Stereo Equipment, *Copper & Copper Products*, Precious Metals & Alloys

Theft coverage is limited to $5,000 in any one loss or disaster unless the vehicle:

1. Is protected by a driver in attendance (a driver is considered not in attendance while temporarily absent having a meal, making a delivery, etc.) or[;]
2. Is protected by an operating U.L. approved alarm system, or;
3. Is located in a fenced area with locked gates and either an operating U.L. approved alarm system or a watchman.

(*Id.* (emphasis added).)[4]

Trans provided MGN with a certificate of insurance as evidence of its cargo insurance coverage.[5]  (DSOF ¶ 6.)  The certificate states:

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.   THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE [ESSEX POLICY]. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.
. . . .
THIS IS TO CERTIFY THAT THE [ESSEX POLICY HAS] BEEN ISSED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES.  LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

---

[4]     This endorsement has a signature line for the insured, but is not signed.   No party suggests that the endorsement does not have full effect.

[5]     Travelers claims that the certificate that MGN attached to its motion for summary judgment is "of unknown origins."  (Travelers's Resp. to PSOF ¶ 13.)  Yet Travelers also admits that the certificate attached to MGN's complaint is one that Trans provided "as evidence that it had cargo liability insurance coverage[.]"  (DSOF ¶ 6.)  These certificates are identical, so there is no material dispute as to the origin or validity of this certificate.

(Ex. G to MGN's Mot. for Summ. J. [24-7] (capitalization in original).)  The certificate of insurance lists the $250,000 limit of liability for cargo, and does not mention the Special Theft Warranty Endorsement.  (*Id.*)  There is no evidence that anyone at MGN saw (or requested to see) any Essex Policy documents other than the insurance certificate.

## IV.    The Travelers Policy

At issue in this case is the scope of the coverage furnished to MGN by its own insurer, Travelers.  Travelers issued a policy to Laser Transportation Systems with effective dates from June 15, 2013 to June 15, 2014.  (Ex. D to MGN's Mot. for Summ. J. [24-4] at 2.)  The following year, Travelers issued a renewal policy, also to Laser Transportation Systems, effective from June 15, 2014 (after MGN had acquired Laser's assets) to June 15, 2015.  (Ex. C to MGN's Mot. for Summ. J. [24-3] at 2.[6])  All of the relevant provisions in the renewal policy are identical to the provisions in the initial policy.  (*See id.* at 2, 6, 10–17.)  On January 2, 2015, Travelers amended the policy to change the named insured to MGN Logistics, Inc. DBA Laser Transportation Systems.[7]  (*Id.* at 38.)

The Travelers Policy included "Contingent Cargo Coverage," which covers a cargo loss when a freight carrier or its insurance company cannot or will not pay.  (Ex. D to MGN's Mot. for Summ. J. at 11; DSOF ¶ 17.)  In the "Contingent Cargo Coverage Special Form," Travelers agrees to "cover 'loss' to Covered Property from any of the Covered Causes of 'Loss.'"  (Ex. D to MGN's Mot. for Summ. J. at 16.)  "Covered Causes of 'Loss'" are defined as the trucking carrier's liability for direct physical loss, with certain exceptions not applicable here.  (*Id.* at 16–17.)  Neither party disputes that the copper coils are Covered Property, that the theft constitutes a loss, or that Trans is the relevant cargo carrier.  (*See* Travelers's Resp. to PSOF [29] ¶ 7–8.)

---

[6]    The court uses the ECF page numbers for this document.

[7]    The court accordingly refers to the insured as "Laser" for the period before January 2, 2015, and as "MGN" for the period including and after January 2, 2015.

The Declarations in the Contingent Cargo Policy set forth the following Limits of Insurance:

| Type of Carrier | Limit of Insurance |
|---|---|
| Railroad Company | $100,000 |
| Motor Transportation Carrier | $100,000 |
| Air Freight Company | NO COVERAGE |
| All Covered Property In Any One Occurrence | $200,000 |

(Ex. D to MGN's Mot. for Summ. J. at 11.)  Section C of the Contingent Cargo Coverage policy warns that "[t]he most we will pay in any one occurrence is the applicable Limit of Insurance shown in the Declarations."  (*Id.* at 17.)  Section E.2 (titled "Additional Conditions: Valuation") limits the Travelers coverage further, as follows:

> The value of Covered Property will be the amount for which the [cargo] "carrier" is liable.
>
> But we will not pay more than the least of the following amounts:
>
> a. The value for such Covered Property stated in any tariff documents, bills of lading, shipping receipts, or contracts;
> b. The cost of reasonably restoring such Covered Property to its condition immediately before "loss";
> c. The applicable Limit of Insurance;
> d. The actual cash value of such Covered Property on the date and the place of shipment; or
> e. The actual limits of the "carrier's" applicable cargo insurance or its equivalent, if such limits are less than the Limit of Insurance under this Coverage Form.

(*Id.* at 18.)

The Travelers Policy also requires that the cargo carrier (i.e., here, Trans) maintain its own insurance.  The certificate of insurance for the Essex Policy, described above, was apparently provided to MGN in accordance with the Travelers Policy requirement in Section E.3:

> Any "carrier" you designate to transport Covered Property must present to you, prior to transporting such property, a certificate of cargo insurance, or its equivalent, that shows Limits of Insurance that are equal to or greater than the applicable Limit of Insurance under this Coverage Form.
> . . . .
> The Limits of Insurance under this Coverage Form will not, under any circumstances, be greater than the actual limits of the "carrier's" applicable cargo insurance or its equivalent.

(*Id.*)  Further, Section E.5 of the Travelers Policy required that Laser attempt first to collect from the cargo carrier's (Trans's) insurer before Travelers would pay for a loss:

> We will not pay for an otherwise covered "loss" until you and your shipping customer have made all reasonable and proper efforts to collect the amount of "loss" from the [cargo] "carrier," or the [cargo] "carrier's" insurer, but were unable to do so due to a:
> a.  Declination of coverage by the "carrier's" insurer;
> b.  Financial inability of the "carrier's" insurer to pay;
> c.  Financial inability of the "carrier" to pay; or
> d.  Lack of response from the "carrier" or the "carrier's" insurer.

(*Id.*)  Section E.10 of the Travelers Policy states that it will not pay a claim "[i]f payment has been made under any [cargo] 'carrier's insurance or self-insurance for 'loss' covered under this Coverage Form[.]" (*Id.* at 19.)  Finally, the Travelers Policy prohibited transferring the rights and duties under the policy without Travelers's written consent.[8]  (*Id.* at 7.)

## V.  MGN's Claims to Essex and Travelers and this Lawsuit

On December 15, 2014, Essex's claims handler, Elite Adjusting & Appraising Services ("Elite") sent Trans a letter advising Trans[9] that the Special Theft Warranty Endorsement applied to the loss of cargo in this case, limiting coverage to the $5,000 maximum.  (Ex. Q to MGN's Mot. for Summ. J. [24-17] at AE034.)  Though the letter did not explicitly state that the vehicle was unsecured at the time of the theft, it quoted the portion of the Endorsement that limited theft coverage for copper when the vehicle was not adequately protected.  (*Id.*)  Around the same time, Elite presented MGN with a "Property Damage Release," effectively offering to settle the claim for $4,000 ($5,000 minus a $1,000 deductible).  (*Id.* at AE026; DSOF ¶ 13.)  MGN refused to sign the release and Essex did not pay the $4,000.  (DSOF ¶ 14; PSOF ¶ 24.)

---

[8]  Except when an individual named insured dies, which is not applicable here.

[9]  The court is unclear whether it was Trans or MGN who made the claim to Essex, Trans's insurer.  On one hand, Travelers does not dispute MGN's statement that it was MGN, not Trans, who made the claim to Essex.  (Travelers's Resp. to MGN's Rule 56.1 Statement of Facts [30] ¶ 22.)  Yet the letter from Essex regarding the claim is addressed to Trans, not MGN.  (Ex. Q to MGN's Mot. for Summ. J. [24-17] at AE034.)  The court accordingly assumes that Trans originally made a claim to Essex, but that at some point MGN stepped into Trans's shoes to pursue the claim directly.

On January 12, 2015, Kevin Hermann, a Technical Specialist at Travelers, sent Laser (MGN's predecessor) a letter denying coverage for the claim. (Ex. F to MGN's Mot. for Summ. J. [24-6].) The letter noted that Essex had offered to settle the claim for $4,000, though the parties do not explain when or how Travelers learned of Essex's disposition of the claim. (*Id.* at 1.) After quoting several sections from the Travelers Policy,[10] the letter explained:

> Coverage is restricted in the event that a valid offer from any [cargo] carriers' insurance is made. Trans Logistics' policy of coverage made an offer of settlement per the limits of their policy. As such, the policy of insurance will not be active to address the loss in a primary, excess or any other basis.

(*Id.* at 4.) But MGN contends that Essex's making an offer—as opposed to actually paying the claim—does not absolve Travelers of liability. MGN also maintains that the Special Theft Warranty Endorsement in the Essex Policy does not limit Travelers's coverage, and that the Essex policy's general limit of $250,000 is the "actual limit" described in section E.2.e.

Accordingly, MGN filed this lawsuit against Travelers and Trans on April 14, 2016, and filed its amended complaint on August 17, 2016. MGN brings three claims against Travelers: (1) breach of contract, (2) a claim for attorney fees under 215 ILCS 5/155, and (3) a request for a declaration that Essex did not make a "payment" under its policy, that the actual limits of the Essex Policy are those stated in the certificate of insurance ($250,000), and that Travelers is liable for the $132,426 that MGN paid to Laars. (*See generally* First. Am. Compl.) MGN also brings claims against Trans for breach of contract (for failing to procure sufficient insurance coverage or to indemnify MGN for the cargo loss) and violation of the Carmack Amendment, 49 U.S.C. § 14706, which provides that motor freight carriers are liable for loss of property being shipped. (*Id.*)

---

[10] MGN claims that Travelers denied the claim based on Section E.10, which specifies that Travelers will not cover any losses that a cargo carrier's insurer actually pays. (*See* MGN's Mot. for Summ. J. [24] 13.) As the court reads the letter, however, Hermann quotes several sections of the policy, but does not attribute Travelers's denial of the claim to any particular section.

Trans did not enter an appearance or file any responsive pleading. On September 29, 2016, MGN requested a default judgment against Trans. (MGN's Request for Default J. [19].) This request will be granted—MGN is invited to submit a proposed order of default and proposed judgment order. MGN has moved for summary judgment on all its claims against Travelers, as well, and Travelers has moved for partial summary judgment, seeking a declaration that its liability, if any, is limited to $5,000.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. In reviewing a motion for summary judgment, the court "view[s] all facts and draw[s] all reasonable inferences in favor of [the non-moving party]." *Title Indus. Assurance Co., R.R.G. v. First Am. Title Ins. Co.*, 853 F.3d 876, 883 (7th Cir. 2017). Where, as here, both parties move for summary judgment, the court construes inferences in favor of the party against whom the motion under consideration was made. *See id.* The court first turns to Travelers's motion, which seeks a declaration that Travelers's liability, if any, is no more than $5,000.

## I.    Section E.2 of the Travelers Policy

Section E.2 of the Travelers Policy defines the "value of Covered Property" as "the amount for which the [cargo] 'carrier' is liable." But it also provides that Travelers will not pay more than the least of five options. Travelers argues that here, the lowest option is Section E.2.e: "[t]he actual limits of the [cargo] 'carrier's' insurance or its equivalent, if such limits are less than the Limit of Insurance under this Coverage Form." According to Travelers, the "actual limit" of the Essex Policy in this case is $5,000, because the Special Theft Warranty Endorsement applies to this loss. Travelers contends that, as a result, it need not pay more than $5,000.

MGN responds that Travelers must pay the full Limit of Insurance, without any reduction in coverage. In support of its position, MGN notes many sections other than Section E.2 that, it

urges, support application of the full limit. MGN also contends that Section E.2.e does not reduce Travelers's liability because the "actual limits" of the Essex Policy are $250,000. **A.**

### A.     MGN Argues that Other Sections of the Policy Require Full Payment

"Because an insurance policy is a contract, the rules applicable to contract interpretation govern the interpretation of an insurance policy." *Founders Ins. Co. v. Munoz*, 237 Ill. 2d 424, 433, 930 N.E.2d 999, 1003 (2010). The court must give effect to the intention of the parties, as expressed in the language of the policy. *Id.* "If the language is unambiguous, the provision will be applied as written[.]" *Id.*, 930 N.E.2d at 1003–04. A policy provision is ambiguous not simply because the parties disagree about its meaning; instead, the court recognizes ambiguity only when there is more than one *reasonable* interpretation. *Id.*, 930 N.E.2d at 1004. "When construing the language of an insurance policy, we must assume that every provision was intended to serve a purpose." *Id.* As a result, the court examines the insurance policy as a whole, not simply its isolated parts. *Id.*

MGN emphasizes several aspects of the Travelers Policy that it argues requires Travelers to pay. MGN notes that the theft is a "'loss' to Covered Property from any of the Covered Causes of 'Loss,'" for which the Travelers Policy provides coverage. (Ex. D to MGN's Mot. for Summ. J. at 16.) But MGN also admits that coverage is "subject to all terms, conditions, limitations, and exclusions set forth in the Travelers' policy." (MGN's Mot. for Summ. J. [24] 9.) That the theft is a covered loss does not end the inquiry.

MGN also points to the Declarations page of the Travelers Policy, which lists "Limits of Insurance" of $200,000 for "All Covered Property In Any One Occurrence." (Ex. D to MGN's Mot. for Summ. J. at 11.) MGN contends that "[t]here is no equivocation or exception" to the coverage limit of $200,000 listed in this Declarations page. (MGN's Mot. for Summ. J. 9.) But that is not accurate: the policy "consists of the Common Policy Declarations *and* the Coverage Parts and endorsements listed in that declarations form." (Ex. D to MGN's Mot. for Summ. J. at 7 (emphasis added).) The Declarations page itself notes the "numbers of forms, schedules and

11

endorsements *forming part of this coverage . . . .*"  (*Id.* at 11 (emphasis added).)  Although Section E.2, which limits coverage to the lowest of five possible measures of value, is not part of the Declarations page, it is still part of the policy as a whole.  One of these five options is the $200,000 Limit of Insurance (*id.* at 18)—essentially, the Limit of Insurance is only relevant when it is the lowest option in section E.2.  Nothing about the Declarations page justifies ignoring the rest of the policy.[11]

Next, MGN contends that Travelers must cover the full value of the coils because Section C of the contingent cargo policy states "[t]he most we will pay in any one occurrence is the applicable Limit of Insurance shown in the Declarations."  (MGN's Resp. to Travelers's Mot. for Partial Summ. J. ("MGN Resp.") [31] 4–5; Ex. D to MGN's Mot. for Summ. J. at 17.)  As MGN interprets this language, it "affirms" the Limits of Insurance.[12]  (MGN's Mot. for Summ. J. 9.)  To the contrary, Section C contemplates that Travelers may pay less than the Limits of Insurance; *the most* it will pay is the Limits of Insurance.  Section C patently does not "affirm" that Travelers will *always* pay the maximum.

Finally, MGN points out that the first part of Section E.2 states that "the value of the Covered Property will be the amount for which the [cargo] 'carrier' is liable."  (Ex. D to MGN's Mot. for Summ. J. at 18.)  But the next sentence qualifies "[b]ut we will not pay more than the least of the following amounts:" and lists the five alternatives.  (*Id.*)  Again, MGN offers no basis on which the court should ignore the remaining language in this section.

---

[11]    MGN also misstates the general limit that would apply to Trans; the Declarations page states that the "Limits of Insurance" are just $100,000 when the cargo carrier is a "Motor Transportation Company," as Trans was.  (Ex. D to MGN's Mot. for Summ. J. at 11.)

[12]    MGN claims that "[t]here is also no statement that the Limits of Insurance [are] subject to any qualification or other terms in the remainder of the Travelers' Policy."  (MGN Resp. 5.)  But as noted above, the policy explicitly states that the endorsements and coverage forms (like the Contingent Cargo Coverage Special Form) are part of the policy, and MGN acknowledges that coverage is "subject to all terms, conditions, limitations, and exclusions set forth in the Travelers' policy."  (MGN's Mot. for Summ. J. 9.)

## B.    Section E.2.e: The Actual Limits of the Essex Policy

Travelers insists it is liable only for the lowest of five alternatives set forth in Section E.2, and that the lowest alternative in Section E.2 is E.2.e: "The actual limits of the [cargo] 'carrier's' applicable cargo insurance or its equivalent, if such limits are less than the Limits of Insurance under this Coverage Form." (*Id.*)  Actual means "existing in fact or reality."  *Actual*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003).  The Special Theft Warranty Endorsement lists certain kinds of thefts where the maximum, or limit, of coverage will be lower than the general limit.  Specifically, though Essex will pay up to $250,000 for other kinds of thefts not named in the endorsement, it is liable for no more than $5,000 for theft of copper coils if Trans failed to take appropriate precautions, as it did for the shipment here.  The limit of the Essex Policy for this theft is therefore $5,000.  Because this is the limit that in fact applies, it is the "actual limit" of the policy for this claim.[13]  According to Travelers, this makes the actual limits of the Essex Policy the lowest alternative.

MGN does not dispute that the circumstances triggered the limits imposed by the Special Theft Warranty Endorsement.  (*See* Ex. B to MGN Resp. [31-2] at AE039 (the driver was absent, there was no alarm on the truck, and the parking lot was not fenced or locked).)  MGN nevertheless contends that the actual limit of the Essex Policy is $250,000, not $5,000.  In six arguments in support of its position, outlined below, MGN focuses on the maximum limits of the Essex Policy in general, $250,000, never effectively taking on Travelers's contention that Essex's maximum coverage for *this theft* is lower.

First, as before, to support its position, MGN invokes a Declarations page, this time of the Essex Policy.  That policy initially provided for coverage up to $100,000; the cap was later increased to $250,000.  The court is not free, however, to consider only this page of the policy,

---

[13]    Of course, $5,000 is still a "limit" of the Essex Policy because it is a maximum, not a guaranteed payment.  For example, a theft of $3,000 of copper coils would only be subject to coverage of $3,000, not $5,000, but the "limit" of such a theft would still be $5,000.

and ignore the others. Language at the end of the Declarations section confirms that the conditions, schedules, and endorsements are part of the Essex Policy. (Ex. H to MGN's Mot. for Summ. J. at AE087.)

Second, MGN argues that the Special Theft Warranty Endorsement "only amended the contract between Trans and its own insurer, Essex[,]" and that MGN did not know about the theft endorsement. (MGN Resp. 4.) MGN's dismay at this discovery is understandable, but there is no evidence that MGN did not have the opportunity to review the Essex Policy and see the limits imposed by the endorsement. Notably, MGN has named Trans as a Defendant for precisely this reason: that Trans failed to obtain the insurance it promised. Trans's apparent breach of its contract with MGN does not change the "actual limits" of the Essex Policy. The theft endorsement exists whether MGN knew about it or not.

Third, MGN argues that the "actual limits" of the Trans Policy are not $5,000 in this instance because $5,000 is a "special limit," not an "actual limit." (MGN Resp. 5.) This expression appears to be MGN's alone; the words "special limit" appear nowhere in the policy or the endorsement. The endorsement is titled "Special Theft Warranty Endorsement" because it covers "special" kinds of thefts. Because the Special Theft Warranty Endorsement applies in the circumstances of this loss, the endorsement sets the "actual limit" of Essex's coverage of this theft.

Fourth, MGN urges that the limit in the endorsement cannot be the Essex Policy's "actual limit" because "the [Travelers] Policy language does not permit such a reading." (MGN Resp. 6 (emphasis removed).) Specifically, MGN points to Section E.3 of the Travelers Policy, which states that the "the Limits of Insurance under this Coverage Form will not, under any circumstances, be greater than the actual limits of the [cargo] 'carrier's' applicable cargo insurance[.]" (Ex. D to MGN's Mot. for Summ. J. at 18.) If the actual limit is $5,000, MGN reasons, then this section would be violated. MGN concludes that "Section E(2)(e) should be set aside[.]" (MGN Resp. 6.)

14

MGN thus reads Section E.3 to mean that if the Travelers Limits of Insurance in the Declarations are greater than the cargo carrier's actual limit, there is necessarily a violation of the insurance policy contract. But as the court reads that section, it instead provides that if the Travelers Limits of Insurance in the Declarations are greater than the cargo carrier's actual limit, then the Limits of Insurance must be reduced to eliminate this disparity. This reading is supported by other contract provisions: Section E.2.e contemplates that the Travelers Limits of Insurance may be greater than the actual limits of the cargo carrier's insurance, which would not be possible if such a scenario automatically resulted in a claim denial. The purpose of Section E.2 is to minimize Travelers's liability, capping it at the lowest of five measures of value. Section E.3 contributes to this goal. Both sections ensure that Travelers's coverage will not be higher than the coverage provided by Essex. Moreover, Section E.5 makes clear that Travelers provides failsafe coverage only if Trans or Trans's insurance could not or would not pay. Section E.3 thus prevents MGN from simply choosing to seek recovery against whichever policy offered more for each loss; Travelers explicitly directed that Essex would be the primary coverage provider. MGN itself acknowledges that the Travelers Limits of Insurance are not fixed: "Section E(2)(e) concerns how a covered loss shall be valued (it . . . specifically amend[s] the Limits of Insurance . . . )." (MGN Resp. 3.)

Interpreting a contract in a way that requires striking a portion of the contract is disfavored. *See Thompson v. Gordon*, 241 Ill. 2d 428, 442, 948 N.E.2d 39, 47 (2011) ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless[.]"); *see also Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 267 (7th Cir. 2016), *as amended* (Jan. 25, 2017) (Under Illinois law, "[w]e also must seek to give effect to each clause and word used, without rendering any terms meaningless."). MGN's interpretation attempts to jettison section E.2.e of the contract; the more straightforward interpretation is that Sections E.2 and E.3 both support the conclusion that Travelers's coverage maximum may be reduced, consistent with limitations imposed by the freight carrier's own insurance policy.

Fifth, MGN urges that the certificate of insurance establishes that the actual limits of the Essex Policy are $250,000. True, the certificate that Essex provided to Trans, in turn provided to MGN, sets forth an insurance limit of $250,000 and makes no reference to the Special Theft Warranty Endorsement. In Illinois, when an insurance certificate does not mention the policy, and the policy terms and the certificate conflict, the certificate controls. *Westfield Ins. Co. v. FCL Builders, Inc.*, 407 Ill. App. 3d 730, 736–37, 948 N.E.2d 115, 120 (1st Dist. 2011). In contrast, "where the certificate of insurance refers to the policy and expressly disclaims coverage other than that contained in the policy itself, the policy should govern the extent and terms of coverage." *Pekin Ins. Co. v. Illinois Cement Co., LLC*, 2016 IL App (3d) 140469, ¶ 33, 51 N.E.3d 812, 820; *see FCL Builders*, 407 Ill. App. 3d at 736, 948 N.E.2d at 120; *see also Sweis v. Travelers Cas. Ins. Co. of Am.*, 993 F. Supp. 2d 881, 882 (N.D. Ill. 2013) (noting that *FCL Builders* "squarely reconfirmed" the "strict enforceability" of such disclaimer language).

In *Pekin*, a cement company hired a plumbing company to install a trash pump on the cement company's property. The plumber obtained an insurance policy that listed the cement company as an additional insured for any claim arising from the plumbing company's negligence. 2016 IL App (3d) 140469, ¶ 1, 51 N.E.3d at 813. The insurance certificate named the cement company as an additional insured, but made no specific disclosure of the fact that the policy excluded claims arising out of the cement company's own direct liability. *See id.* at ¶ 7, 51 N.E.3d at 815. When one of the plumber's employees sued the cement company for negligence resulting in on-the-job injuries, the cement company sought a defense under the policy, but the insurer denied the claim, citing the exclusion for direct negligence actions. *See id.* at ¶¶ 8, 23–24, 51 N.E.2d at 815, 819. In affirming a declaratory judgment for the insurer, the appellate court emphasized language in the insurance certificate confirming that the policy terms controlled. *Id.* at ¶¶ 32–33, 51 N.E.3d at 820–21. Consequently, even though the plumbing company, not the cement company, was the party who procured the policy, the insurer

had no duty to defend the cement company or cover the claim brought by the employee. *See id.* at ¶ 40, 51 N.E.2d at 822.

Similarly, in *FCL Builders*, a general contractor, FCL, hired a subcontractor, Suburban, and required Suburban to procure insurance coverage for FCL. 407 Ill. App. 3d at 731, 948 N.E.2d at 116. Suburban, in turn, hired its own subcontractor, JAK, and their agreement required JAK to purchase an insurance policy providing for coverage of JAK, Suburban, and FCL; the Suburban/JAK agreement also incorporated by reference the FCL/Suburban agreement. *Id.* at 731–32, 948 N.E.2d at 116. The policy JAK purchased, however, limited coverage to parties with whom JAK "ha[d] agreed in writing in a contract or agreement that such person or organization be added as an additional insured." *Id.* at 732, 948 N.E.2d at 116–17. When JAK's employee was injured and filed suit, the insurer sought a declaratory judgment that it was not required to defend FCL because JAK had no written contract with FCL. *Id.* at 732, 948 N.E.2d at 117. Despite the fact that the insurance certificate listed FCL as an additional insured, the appellate court affirmed summary judgment in favor of the insurer, noting the policy's strict requirement of a written agreement between JAK and its additional insured. *Id.* at 734, 736–37, 948 N.E.2d at 118, 120–21.

As these cases demonstrate, Illinois courts strictly enforce policy language, even where that results in denial of coverage that an insured party reasonably expected, and even where denial results from the failure of a third party to contract for adequate coverage. In this case, the Essex insurance certificate states explicitly that the limits of coverage are subject to the terms and conditions of the underlying policy, and that the certificate itself does not alter the coverage. The certificate therefore affords no escape from the limitations imposed by the Special Theft Warranty Endorsement. MGN admits that the certificate is not part of the policy, and nothing supports MGN's contention that the certificate establishes that the actual limits of the Essex Policy are $250,000. (MGN Resp. 7.)

Finally, MGN contends that both parties have proposed reasonable interpretations of "actual limits," and therefore the court must defer to the interpretation favorable to MGN, the insured. That principle arguably would be appropriate if the expression "actual limits" were ambiguous in this case. But it is not. "Actual limits" means the limit of the Essex Policy that in fact applies to a particular loss. Reading the Essex Policy language as a whole leads to the conclusion that the actual limit for this claim is $5,000. This means that the coverage afforded MGN under the Travelers Policy is limited as well, to $5,000, the lowest alternative measure listed in Section E.2.

The Essex Policy limits are intended to limit the moral hazard and require an insured cargo carrier—in this case, Trans—to take steps to safeguard valuable cargo. The Essex Policy does so by drastically limiting the insurance coverage available to Trans if it fails to take such steps and loses the cargo. At the heart of MGN's complaint is the sense that it is unfair to impose these limits on MGN as well; MGN, after all, cannot directly control Trans's behavior. But moral hazard is an issue for MGN itself, as well; MGN could have reviewed the Essex Policy itself, not just the certificate, to ensure that the policy provide adequate coverage, or could have taken steps to ensure that carriers it hired adequately protected their vehicles. MGN could have negotiated for more comprehensive coverage from Travelers. MGN did not do so, and Travelers is obligated to pay no more than $5,000, less any relevant deductibles, on MGN's claim.[14] The court therefore grants Travelers's motion for partial summary judgment.

---

[14] A case decided after briefing was complete on this motion bears brief mention. In *Streit v. Metropolitan Casualty Insurance Co.*, 863 F.3d 770 (7th Cir. 2017) a fire insurer denied coverage for a house fire set by the homeowners' son (himself an insured party), citing the exception for intentional loss. *Id.* at 772. The homeowners sued, and the district court granted summary judgment in their favor. *Id.* In affirming, the Seventh Circuit held that "[i]f one insured party commits an intentional harm but another insured party is innocent of any wrongdoing, then the insurance coverage is suspended only as to the insured who caused the loss." *Id.* at 774. *Streit* is distinguishable from this case because the exception invoked by the insurer there violated the Illinois Standard Fire Policy, which trumps inconsistent provisions as a matter of Illinois law. *Id.* at 773. No such standards are at issue in this case, which involves a commercial liability policy.

## II.    MGN's Requested Declaration that Essex Did Not Make a "Payment"

Because Travelers's liability is limited to, at most, $5,000, the court must deny MGN's motion for summary judgment on its breach of contract claim.   But MGN also seeks a declaratory judgment that (1) Essex did not make a "payment" under its policy, (2) the actual limits of the Essex Policy are those stated in the certificate of insurance ($250,000), and (3) Travelers is liable for the $132,426 that MGN paid to Laars.   Having granted partial summary judgment to Travelers, the court denies summary judgment on MGN's requested declaration of the actual limits of the Essex Policy and the amount of Travelers's liability.   That leaves open the question of whether Essex's offer to pay $4,000 was a "payment" within the meaning of Section E.10 of the Travelers Policy.

Section E.10 provides that Travelers will not pay a claim if there has been "payment" under the cargo carrier's insurance.   MGN points out that while Essex made an offer to pay the claim for $5,000, MGN did not accept the offer.   Travelers does not respond to MGN's assertion that Essex did not make a payment, and it is undisputed that Essex did not pay money to MGN. MGN is therefore entitled to a declaration that Essex did not make a "payment."

That said, MGN cannot manufacture coverage for itself by declining to accept the amount that was available to it.   As Travelers notes, under Section E.5, Travelers will only pay for a loss when MGN has made "reasonable and proper efforts" to collect from Essex, but Essex cannot or will not pay.   Neither party here has sought summary judgment on the issue of whether MGN's refusal of Essex's offer was "reasonable and proper," and the court declines to decide the issue.

## III.    MGN's Request for Attorney Fees Under 215 ILCS 5/155

MGN also moves for summary judgment on its claim that it is entitled to attorney fees under 215 ILCS 5/155.   Section 5/155 allows for an award of attorney fees when an insurance company's denial of a claim or delay in paying a claim is "vexatious and unreasonable[.]"   215 ILCS 5/155.   As MGN acknowledges, "[i]f there is a bona fide dispute about coverage, delay in

settling a claim may not violate the statute." *Golden Rule Ins. Co. v. Schwartz*, 203 Ill. 2d 456, 469, 786 N.E.2d 1010, 1018 (2003) (italics removed). MGN apparently maintains that Travelers's refusal to pay anything, when it may be liable for $5,000, is vexatious and unreasonable because it amounts to a denial of a proper claim.

Travelers's failure to pay does not appear to be vexatious.[15] As discussed above, if MGN's refusal to accept Essex's offer for the limits of Essex's coverage did not constitute "reasonable and proper efforts" to collect from Essex, then Travelers may not be liable at all under section E.5. Travelers also points to the provision of the Travelers Policy that prevents assignment of the policy without Travelers's written consent. Because Travelers issued the policy to Laser, who then assigned the policy to MGN without Travelers's consent, Travelers contends, Travelers need not cover any of MGN's losses. The court need not evaluate the merits of these arguments, but concludes that they do find some support in the policy documents and are therefore not vexatious. Accordingly, the court denies MGN's motion for summary judgment on its request for attorney fees under section 5/155.

## CONCLUSION

Travelers's motion for partial summary judgment [21] is granted. MGN's motion for summary judgment [24] is denied, except as to the declaration that Essex has not made a payment to MGN. The court will grant MGN's request for a default judgment against Trans [19] upon MGN's submission of a proposed order of default.

---

[15] MGN points out that Travelers asks the court to declare that its coverage, if any, is limited to $5,000, but in responding to MGN's summary judgment motion, Travelers argues that it need not cover the claim at all. MGN contends that these alternative arguments "strongly suggest[] at the outset that the denial of coverage was arbitrary." (MGN Resp. 3.) The court disagrees with MGN's suggestion that the recognized practice of taking alternative positions in litigation somehow establishes bad faith.

ENTER:

Dated:     August 31, 2017     _____

REBECCA R. PALLMEYER
United States District Judge